Good morning, everyone. We have six cases on the calendar this morning, four of which are being argued and two of which are being submitted on the briefs. I will just note for the record the two cases that are being submitted on the briefs. The first one is number 06-7029, Browder v. Department of Veterans Affairs. The second one is number 06-3093, Ashworth v. the Merit Systems Protection Board. Again, those two cases are being submitted on the briefs. The first of the four cases that is being argued today is number 05-3328, Anderson-Deloatch v. the Veterans Administration. Mr. Nichols, I just want to make sure that I confirm that you have reserved five minutes of your time for rebuttal? MR. NICHOLS Correct. MR. BROWDER. Okay. Well, you can step up and begin your argument whenever you're ready. MR. NICHOLS Okay. I appreciate the opportunity to be here and to present an argument on behalf of my client. There's a lot of issues in this record, and I'm sure that you have some questions on some of these. I did not know exactly where I needed to hone in. So I'll start off, though, by pointing out that in the Respondent's Brief on page 16, they said it was not necessary to respond to one of our arguments because the initial decision had not found that my client had violated that charge. But if you'll look on page 16 in our appendix, it will show that the judge did. It's page 16 of the Respondent's Brief and also page 16 in the appendix. And that dealt with access to records. And that was an important charge here that the administrative judge ruled on. And that charge also dealt with the denial of a witness. Russell Reed, who was the information security officer for the VA, had done an investigation, and it was relevant to these charges. And I had asked that this person be a witness, and the administrative judge turned me down. I noted my objections to that on the record. And then when we were at the hearing, there were some documents also relating to that, some e-mails that dealt with that issue, and the judge refused to even admit those documents. Mr. Nichols, let me ask you, your case, you're pointing to an evidentiary ruling at this and then the penalty of demotion was imposed, correct? Correct. So you have two ways of having your client prevail, either convincing the panel, the court, that there was an error in finding the charges sustained, or in the penalty. Why don't you, one thought I had perhaps, maybe why don't you focus on where you feel the decision of the board is most vulnerable on those points? In other words, focus either on the determination that the offenses were committed or focus on the penalty, whichever you feel is your strongest card. Well, I think that it was clearly erroneous for the judge to separate the charges the way he did on charge one. He combined them and then he separated them. And so I was arguing in the hearing one position based upon what the judge had told us that he was going to, what the issue was, and then after the hearing, he separated them out again, so I had to argue. That may be more of an evidentiary. But those two points were not dependent upon one another, were they? Well, based upon the issue, I sure thought they were, the way that he framed the issue between the lunch breaks and the excessive time spent. Well, there are two items, two circumstances, but the facts that would establish one don't necessarily establish the other and vice versa, correct? If they are factually independent, they're not dependent on one another to establish a single event. They are separate factual circumstances that are independent. Well then, I think the judge should have laid that out when we had our pre-hearing conference and that when he framed the issue that we were going to be litigating, that should have been pointed out. Instead, he combined those as if they were on charge. Well, how was that prejudicial? How were you prejudiced by his doing that? I think I was prejudiced by, I was arguing based upon one issue and the judge made the decision based upon two separate issues. I think that was prejudice. But Mr. Nichols, doesn't it really come down, as I understand the case, and please correct me if you think I'm wrong, it seems to be that the basic nub of the agency's complaint with respect to your client is that she didn't perform her supervisory responsibilities, primarily with respect to Ms. Ping. There was also a charge, I think, that she had used harsh language or accused someone of being a liar, some other person. But leave that aside for the moment. I mean, the real thrust of it was that, you know, she fell down on her supervisory responsibilities. Don, I mean, don't you agree that was basically the charge against her? I think that was the overriding issue there. But I think the judge made an error because he said part of the reason was that this supervisor, my client, Diane Anderson Deloge, was a friend of Sharon Ping. Well, that was totally not what the record showed. The record showed that they were not friends. But he made that, took it out of the whole cloth, I guess, and said that they were friends. Well, but whether assumed for the moment, and, you know, you have a, it's always difficult to overturn a fact finding, but assume for the moment that you're correct on that, that they, in fact, were not friends, but the record doesn't show that. I mean, whether or not they were friends, the problem here was, in the agency's view, that Ms. Anderson Deloge was not performing her supervisory responsibilities in terms of making sure that Ms. Ping did not take overly long lunch periods and that she did not spend too much time in someone else's office, and that this created a bad climate in the work environment. And I think the... And it didn't, in other words, the finding, I guess what I'm saying is the finding that they were friends didn't impact that. Well, I think the complaining parties here about the relationship, one was a probationary employee, the other one was an employee who was subject to discipline, and she was the one referred to as a liar, her job was going to be changed, and that is when she started reporting these allegations of activity. And I think a strong point here is that Mrs. Deloge did deal with it. She did deal with the allegations that were brought to her on both occasions. She did counsel. The record does show where she talked to her. In April... When you say talked to her, you mean Ms. Ping? Ms. Ping, yes, about this. There are numerous minutes of staff meetings that Ms. Ping was in where this was emphasized about lunch breaks. In April of 2003, when Dr. Buddy, who was an employee, was also one with Ping, counseled his employee about the excess, Diane Anderson Deloge did the exact same thing. She counseled her employee. And it all stopped right then in April of 2003, not in June of 2003 or September of 2003, but in April of 2003. So I think there needs to be some knowledge. At least the supervisor needs to have the knowledge. Now whether or not... If knowing something or allowing something, just because an employee is doing something and you're not aware of it, is that enough to be demoted on? Or should there have been another, maybe a performance improvement plan or something like that? I just think this was with 30 years of exemplary record that this supervisor had and the record will show that she had several hats that she was wearing. She was the acting administrative officer. She had three or four other duties that she was responsible for, not just Ms. Ping. And other issues here, the administrative judge made credibility determinations on a telephone witness. I objected to this witness being there by telephone. He overruled my objections. But yet he made a credibility finding based upon telephone testimony. And I think that was wrong. Mr. Nichols, this is an area which is highly fact specific and there's evidence in the record really on both sides of these questions. And isn't it difficult to hear that our standard of review is substantial evidence? Does substantial evidence support the decision of the board? And isn't that a very tough burden for you to carry at this point? It is very tough. And I think that some of the factual issues that I've pointed out have shown that some of the judges' fact findings were clearly erroneous, not just not substantial. I just think they were wrong. Well, let's take the example that you give about they're not being friends. How do I tell from the record? I have it pointed out in one of my briefs that that goes with dialogue where Ms. Anderson was testifying about the relationship that she had with Ms. Payne. Well, where do I find that? I will tell you in my rebuttal times. That's okay, Judge Dine. Mr. Nichols, thank you. You've gone slightly into your rebuttal time, but we'll give you your full five minutes on rebuttal. And we'll hear from the government now. Mr. Smith? Thank you, Your Honor. May it please the Court? Mr. Smith, at least from my standpoint, it might be helpful, I can only speak for myself, if you would sort of come to grips in whichever way you think appropriate with Mr. Nichols' argument when he was up at the stand to the effect that there's a lack of substantial evidence here. In other words, the judge erred, the A.J. erred in the fact findings with respect and he focused in particular on the point about the alleged friendship between Ms. Payne and Ms. Anderson Deloach. And from my standpoint, more importantly, he says that the record supports the proposition that, in fact, his client did counsel Ms. Payne and that the conduct stopped prior to the time that it's alleged it stopped. Okay. First of all, I want to make one point, and that is that Ms. Anderson's argument here appears to challenge some of the factual findings that the Board made. It doesn't go to the issue of whether there is substantial evidence. Ms. Anderson would essentially have to refute all of the findings, the factual findings that the Board made, rather than the individual ones.  Well, that can't be true. That absolutely can't be true. If the trial court makes several findings and combines those to reach a conclusion, you don't have to refute all of them. If the decision rests upon one erroneous factual finding, that's sufficient to set it aside. Absolutely. If it rests on one factual finding, if it rests on ten and the appellant proves that one of them was incorrect, that still leaves substantial evidence to support the decision. That was my point there, Your Honor, that even if some of the factual errors that Ms. Anderson alleges here are true, there is still substantial evidence to support the Board's decision. Well, what you have to do is you have to ask if the erroneous finding would have affected the result, in other words. Okay. Whether it's harmful error. Well, and I think that's a good opportunity to address the Court's earlier question about the friendship issue. Frankly, I don't believe that the friendship issue is relevant to the Board's finding. And that's an example of a factual finding that the Board made that Ms. Anderson challenges that even if correct, doesn't mean that there isn't substantial evidence to support the Board's finding. But having said that, there is substantial evidence or there was at least evidence in the record that went to the issue of whether Ms. Anderson and Ms. Ping were friends. And I'll refer you to appendix page 115, which if you have your appendixes in front of you and care to look at it, is at tab 28. And it was a report of contact where Mr. Hamilton is relating some conversations that he had. What page? He was dealing with Ms. Dolan. What page are you referring to? Appendix page 115. 115. Where on the page? I'm sorry. Where on that page? Yeah. Down, about three-quarters of the way down the page, there is a sentence that starts with Ms. Dolan stated that she felt that this confrontation with Ms. Anderson Which heading is this under? I'm sorry. It's under background. I hope you have the right page. Well, I'm looking at page 115. Yeah. Which begins clinic policy memorandum. Oh, no. I'm sorry. I hope I'm not confused about the pagination of the appendix. Well, the pages seem to have been renumbered. 115, what's at 115, Mr. Smith, appears to be a document titled Patient Rights and Responsibilities. It seems to be an instructional document. It doesn't relate to the particular facts of this case. Okay. Well, I apologize then. I'm a little bit at a loss myself. Let me see if I can try to, at least for the record, indicate what document I'm referring to. It is called a report of contact. It is dated June 9, 2003. It appears to be 151. The pages have been renumbered. Okay. All right. Well, I apologize for my confusion then. The report of contact indicates that Ms. Dahlin was interviewed by Mr. Neal Hamilton, the human relations specialist. And it says Ms. Dahlin stated that she felt that this confrontation with Ms. Anderson in front of Mrs. Bainbury was a direct result of her complaining about Sharon Ping, who is friends with Diane. And it goes on to talk about this confrontation that occurred. Again, there is evidence in the record that at least some people felt, i.e., Ms. Dahlin in this situation, that Ms. Anderson and Ms. Ping were friends. Again, I don't think that that factual issue, number one, was even terribly relevant in the Board's decision, or that if incorrect, it would affect the substantial evidence to support the Board's decision. But to address the issue of whether there was evidence in the record regarding whether Ms. Ping and Ms. Anderson were friends, I hope I've just shown you some, albeit with my confusion about page numbers. Mr. Smith, what about the argument that once the problems were brought to Ms. Anderson Delosha's attention, she took action, she met with Ms. Ping, and the problem stopped? Yes. That is another issue, again, that involves factual weighing of credibility and fact-finding. I'll refer to the Board's decision at page, well, I guess we can start with page three of the Board's decision itself. And that is where the Board is essentially summarizing the testimony that it relied on, i.e., the evidence that it weighed, in order to support that particular charge, i.e., the lunch break charge. And the Board goes over the gist of Ms. Dolan's testimony, and Ms. Dolan's testimony certainly supports that. It talks about Ms. Ping's long lunches, looks like about two-hour lunches, quote, several times, and it says each week. And then it goes on and says, on cross-examination, Dolan testified that the appellant took two to three long lunches each week for 18 months. That is the entire course of her employment. It goes on to summarize the testimony of the other witnesses. At least the Board's decision itself does not specifically say for 18 months or for 10 months or for nine months or whatever. Isn't there evidence that suggests that Ms. Anderson Delosha was really not aware of this problem? Yeah, well, frankly, that's one of Ms. Anderson's arguments, is that she admits that she wasn't aware of this problem. And again, that's, you know, it's almost a you lose either way kind of thing. If she was aware of it and didn't take effective measures, that's a problem. She's a supervisor, and that's her job to do that. Or if she wasn't aware of it, that's a problem, too, because that's her job to be aware of something like this. The Board is quoting from four different witnesses about, and the witnesses' testimony is fairly consistent. We're looking at, you know, one to two-hour lunch breaks every day or several times a week. Four witnesses testifying to essentially the same thing is a chronic problem. I don't think anybody would debate that. And there's no question that this is not a terribly large office or an environment here at this clinic. Ms. Anderson should have been aware of. Well, but that's not, there was evidence relied on by the Board that the lunch period infractions were being reported to her. It's not as though they were going on and she had no awareness of them. Right. Again, it's a either-or argument. She says she didn't know about it. Well, but I'm not sure that if she didn't know about it that the Board's decision here would be sufficient. If the Board, if the record established that she didn't know about it, there aren't any findings here, as I understand it, that she should have known about it. I thought the Board's decision rested on the fact that she was advised of it because employees told her about it. No. I beg to differ, Your Honor. I believe the Board's decision is, in fact, based on both. That is, that she was told about it and that even if she wasn't, she should have known about it, i.e., the point that we're making. That is that it was her job to be personally aware of these circumstances. If you'll give me a minute, I might be able to find it in the decision, but I know it's there. Where does the Board say that even if she didn't know about it? Let me see if I can find it. Oh. Well, if you can't find it. Yeah, and I may be confusing the other issue, that is, the fact that Ms. Ping was spending excessive amounts of time with Dr. Darnell in his office, that that was something that she should have personally known about. I agree that the Board certainly did find that Ms. Anderson was, in fact, informed about that. And, again, I think that goes to one of the points that Ms. Anderson raises in her brief. Ms. Anderson says there was only one person under Ms. Anderson's direct supervision who undisputedly reported this problem to her. Ms. Neely, I think, is the name. And, again, it's a cat-out-of-the-bag situation, that is, how many does it take? Do you need to have all four of the witnesses that were relied upon by the Board, or is one person reporting to Ms. Anderson this problem enough to then trigger a duty on her part to talk to all these other people or to investigate the situation herself? And, of course, we argue that it was. Are you saying, I think getting back to the point you were making earlier, Mr. Smith, at Page, that you were saying that it was an either-or, either the Board found either she didn't know, and she should have known, or she knew and didn't act? Were you thinking of the statement at page 10 of the Board decision where the A.J. says, in my view, it makes no difference whether or not she was aware of Ping's absences? Yes. I apologize for not finding that myself, but, yeah. Was that what you were thinking of? Yes. Right. That paragraph that starts, there can be no doubt? Yep. And, again, that raises – and, frankly, that goes back to the question that you had earlier, that is, what if the counseling in April of 2003 was effective? And I cited some testimony to you about 18 months of this problem, which indicates that it wasn't effective, but even if it was, we are talking about a time period from October of 2003 all the way – I guess it's October of 2002, or all the way up to April of 2003, that is, the first half, if you will, of Ms. Ping's employment. That's a long time, we indicated. I counted that in the briefs. It's approximately six months, or a little over six months. That's too long for this type of chronic problem to be going on without a supervisor, A, knowing about it, or B, doing anything effective about it. The board itself suggests a simple solution, that is, that Ms. Ping simply be required to report to Ms. Anderson whenever she was going to lunch and coming back. That certainly appears to be something that would have been effective, and that an effective supervisor should have done something like that for that itself. That – there was a point raised about factual findings. This is a lot of – this decision was based a lot on factual findings, credibility determinations. There were witnesses, obviously Ms. Ping herself or Ms. Anderson herself, who testified contrary to what the board eventually found. Those are factual findings that are virtually unreviewable, is the quote that we used in our brief, by this court. There was a hearing, two days. The board spent some time on this. They analyzed this in a rather lengthy opinion, and those simply are factual findings that this court doesn't review. If the court doesn't have any further questions, I thank you for your time, and I'll sit down. Thank you, Mr. Smith. Mr. Nichols, as I said at the close of your opening argument, you have your full five minutes of rebuttal if you need it. Thank you. Judge Dyke, my appellate experience, you've been on two-thirds of the panels. So this is my second – third appellate appearance, and you're my – you've been on two-thirds of them. But I found the citation in the record about the Friends, and so in the appendix, page 90, there's some testimony there. Now, the other – another issue here, calling – But even if there is some testimony that they weren't Friends, this other document on page 151 supplies evidence that they were, right? So you've got conflicting evidence on the board. Well, I think if you would look at – Wait, wait, wait. It could make a finding that they were Friends, right? The testimony of Ms. Dahlin, though, I'm sure – I'm not sure exactly if that's the document we're referring to, but she could not admit that even one of those meetings took place. So – but, you know, you're right. If they could find a claim that they were Friends, but I don't think it's supported in the record that they were Friends. Like a complaining employee who says somebody is a friend of somebody else, and then that Mr. Anderson-Deloach testifies directly that they were not Friends, and I think that ought to carry the day on it. But if – that's just – they were not Friends, and I think the record reflects they were not Friends. Now, you talk about notice. Some employees, each time, you know, AJ, the administrative judge, says some employees reported this. There was only one employee, and she dealt with it when it was reported to her. That was Ms. Neely. Ms. Dahlin, even though she worked, could report any of this to Diane Deloach for this 18-month period, never did. Never did until she started getting in trouble herself, and then it started. Calling somebody a liar has been one of the charges that was sustained here. She did not call Ms. Dahlin. The charge was she referred to her as a liar with her own secretary. Now, there needs to be some type of privilege if a boss cannot tell their secretary what their feelings are about another employee. I'm sure in all organizations you have that, and yet she's being held for disrespectful conduct for a conversation that she was having with one of her subordinates who's in some type of confidential relationship, or should have been. The excessive time in office that counsel referred to, I think that particular portion of the charge was dismissed and not sustained. You talked about the penalty phase. If you go and you look at the proposing officials or what she would have done if some of these charges were not sustained, it was very confusing. It looked to me like she would not have proposed a demotion based upon what ended up being sustained. Demotion was the originally proposed penalty, correct? Yes. It wasn't a situation where there was a proposed removal, and then the deciding official mitigated it to a demotion. It was always a demotion. It was always a demotion, and several of the charges were dismissed. And a demotion of this level? Yes. It wasn't going to be a greater demotion than it was made a lesser demotion. Correct. I think they made an offer in their removal letter that if she agreed to accept it, they would only make it one grade. But it was a two-grade proposal. Originally it was a two-grade. Well, it was from 11 to 9. But the pay difference isn't that great. $5,000 a year for a person with 30 years' experience. I'm sorry, what is it? $5,000 a year for a person with 30 years' experience. It will make a difference, especially on retirement. There were no grade 10 spots, though. Well, if you look at their letter to her offering her that we won't do this, they offered her 10 if she won't appeal it. It would be part of the record. I can't go to it right now, but that was part of the record in their removal. So I think that shows there should have been a 10 there. But I think the access to records is important. Reed should have been allowed to testify on that. The judge found that the agency was sustained, that charge was sustained, and it would not have been if we had been able to have those documents admitted and also have had the opportunity to deal with that particular witness. Thank you, Mr. Nichols. Thank you. The case is submitted.